Good morning, Your Honors. May it please the Court, I'd like to reserve three minutes for rebuttal if I could. My name is Jacob Wessel and I represent Ryan and Laney Berrett against Clark County, Idaho School District. And this is a case where the facts are kind of messy, but the law is pretty clear on this. And I'll just point out that the district court granted summary judgment to the school district based upon causation on all of our counts. And specifically under the McDonnell-Douglas analysis under the pretext portion and found that we had not shown that there's a question of fact as the pretext. Let me ask you, with respect to the Facebook post, put aside your evidentiary objections to it. Let's assume it was properly, it's evidentiary that it could be admissible. Do you agree that taken alone, that is sufficient reason to terminate an at-will employee? It depends on which Facebook post you're talking about. Well, how about let's take the worst one. Let's take the comment that calls the, his superior chuckles the clown. With respect to that one, let's assume that's all that occurred here. I work for a department. I say something derogatory about my boss on Facebook. I am an at-will employee. Is that a valid business reason for them to fire? It may be, but I would point out that in the Curley case, which is an Idaho Supreme Court case, the woman had been writing notes about her coworkers and calling them Muffy and Buffy in the notes. And the court found that there still was a question of fact as to whether that was the reason for the termination. But as I read Curley, is that if there is a valid reason for the termination, and there may be also some other stuff on the side that wouldn't have been valid, that as long as there's one valid reason for the termination, the fact that you may have other reasons that are bad doesn't mean that it wasn't a valid termination. Do I misread Curley in that way? Well, I think it depends on if you have direct evidence of discrimination or only circumstantial evidence. Right. And here there's no direct evidence of discrimination, is there? Well, I would argue there is on two points. Number one, when they either in April of 2012, this was a month after Mr. Barrett had basically blown the whistle about the safety violation of the COVA. I put aside the whistleblower claim, by the way. I'm just focusing on your ADA claims. Right. And under our ADA claim in April, Mr. Kearns raised the rent basically from $50 a month to $350 a month. And the reason he said for raising it was because Mr. Barrett was disabled and he would lose his disability benefits. But it seemed like the focus there was, at least based on his statement, there may have been other motivations. But based on his statement, it wasn't because Mr. Barrett was disabled. It was a professed concern that his disability payments would be reduced, which is a concern he had repeatedly expressed, which was why he wouldn't take full-time work. So that is on account of an economic consideration, not because I don't like this person because he limps type reason. So that seemed to me to be distinguishable on ADA grounds. I think there is a question of fact as to whether he continuously expressed that I can only make $1,000 a month. I don't think that is supported by the record. And Mr. Kearns even said when he did it, well, we just found out that he could only make $1,000 a month. And because of that, we decided to raise the rent back up to $350. So I thought there was evidence that the reason that he rejected the county's offer of full-time work was he was concerned about losing his disability payments. No. At the beginning of his employment in 2010, he basically asked for three accommodations because he was disabled. One, to take part-time work, no mention of how much he could make. Another one is they promised to hire him some help because this had been a full-time job for non-disabled individuals before. And number three, they said that he would have light-duty work and all he would have to do would be call contractors to come do the work. And then he ends up getting fired. And one of the reasons, and, you know, this is, I think, it has to be a mixed motive case because there were multiple reasons for his termination in his termination letter. But the final reason was you're not doing well in your maintenance duties and you can't change your life goals. And as I understand it, there's no evidence in this record to support that contention. Is that right? To support what? The last contention. The letter says you're firing you because of the Facebook post, to make it a shorthand, which may well be a valid reason. And also because you're falling behind in your job. Your job, you're not performing your job very well. And in subordination. Right, in subordination. By the way, I think there was a lot of evidence of insubordination. So we get to this last one. Is there any evidence at all in this record that he wasn't performing his duties satisfactorily? Not that I'm aware of. All of his performance evaluations were great. Mr. Kearns even says, I didn't have any problem with his performance until I wrote this letter. And so in his deposition, he said that he was performing appropriately. He says, you would agree that you weren't fired because of your failure to perform some duties. And he said, correct. And the question was, you were successful in performing all the duties and responsibilities. Correct. So his testimony is, there was no decline in performance. Well, right. He tried. He didn't have anyone to help him and he wanted to get the work done. So he did his best. Well, this doesn't say that. But obviously he wasn't able to do it. You were successful in performing all of the duties and responsibilities that you had been assigned. And he said, correct. He was successful except that he was fired for not being successful. It's not a hostile question, I think. She's just asking you what the record says. Right. So in light of that is your argument that this reason for termination, there were three reasons maybe, that this reason was pretextual because there's no evidence that he wasn't doing his duties correctly? Correct. At least there's a question of fact as to that. Okay. So I get back to Curley then. If we have two legitimate reasons and one illegitimate reason, what do we do? Then since there's direct evidence, you – Well, that's my problem. Let's assume there's no direct evidence of discrimination. All we have here is we know he makes a prima facie case because he's discriminated. We know they come back with reasons. Two of them are good and one of them isn't. Let me just – that's what I'm thinking out loud. What do we do in a case like that? Then there has to be no question of fact in order to grant summary judgment that it was the determinant factor in terminating him. And they would have done it anyway if none of this other stuff had gone on. Yeah, and see, that's – so you're getting to the point that's troubling me about this case and maybe you can help me on it. It looks to me that the reason that he gets fired is he gets in a spitting match, let's call it, with the superintendent. That record seems to be overwhelming about that. And then they fire him and they also say something that may not be true. And so if I were to conclude on this record that there's just no way he was going to continue in the job after all these other things happened, does it matter that they also threw in a bad reason? Oh, if you conclude that he wasn't going to continue anyway because of the other reasons? Right, but if I conclude that the Facebook post and the insubordination are established and are valid reasons and that he surely would have been fired because of the two of them, does it matter that they also said incorrectly your job performance has gone down? If that was the case, I would agree it wouldn't matter. But that's not the case. I know that's not your case. I'm trying to get your understanding of the legal framework. I guess, so even if his job performance hadn't gone down, in fact, why is a complaint that you're not performing up to our standards based on discrimination related to disability? Is that your argument? Yes, for two reasons. Number one, they had promised him to accommodate him in those two ways that I said. But if, in fact, he was performing his duty successfully, which is what he states in his deposition, I think in his affidavit there may be, he may contradict himself, but that can't create a genuine issue of material fact. So if he's performing his duties successfully, then it's a pretextual reason, but the pretext is we want to fire you because you're insubordinate and cursed at me, which may be wrong for other reasons, but not for a violation of the ADA. I think the problem with that is you have to focus on what the district thought about his performance, not his own, because they're the ones that fired him. And if they thought he was not performing up to par because, you know, because he couldn't climb a ladder and change a light bulb, then that has to do with his disability. Mr. Kearns knew he couldn't do that. Is there any evidence that that's what the county thought? Yeah, in the letter. They just say your performance is declining, you're not changing the light bulbs, but that doesn't say, that says you're not doing the job for which we hired you. And then there has to be some evidence that he was doing the job, but they didn't like him because he was disabled, and that's where I didn't see that link. That's where Mr. Kearns' deposition comes into play, where he says, well, I knew that he couldn't change the light bulbs because he can't climb a ladder. And so that's the connection between his disability and that portion. But I think it all comes down to the retaliation. He, in March, for the first time, he brought a letter. Retaliation is a state law claim, though, correct? Yeah, the whistleblower retaliation claim. And then we have other evidence of our ADA claims also that they're related. But on your retaliation claim, I wanted to ask you a question. I understand why the ADA claims were brought on behalf of Mr. Barrett and Mrs. Barrett, because she's a derivative beneficiary. She didn't do any whistleblowing. There's no evidence in this record that she engaged in any whistleblowing, is there? There's not. So why does she have a whistleblowing claim? Well, she has a whistleblower claim both under the Vann decision, Idaho Supreme Court case decision, which talks about the requirements of a whistleblower claim, and under Idaho's. I've read the decision. Tell me why, since she didn't do anything, right? She didn't touch a whistle. Right. Tell me why she has a claim under the Whistleblower Act. Well, the intent of the statute was to protect against adverse employment actions for employees. Because adverse employment actions get employees arising out of their disclosure of certain information. She did not disclose certain information. So you said the judge based his decision on causation. He did. He didn't get to that. Tell me what whistleblowing caused her to be. It was Mr. Barrett's whistleblowing that you're contending caused her to be. It was Mr. Barrett's whistleblowing that got her fired. Okay. So is that, as I understood that claim, it is essentially that that is a wrongful discharge tort claim, which you incorporated into the complaint under the rubric of the whistleblower statute. That is, if I blow the whistle, my employer can't say, oh, that's terrific, I'll go fire your husband. I can't fire you under the statute, but I can go fire your husband and your children and, you know, your second cousin, to get back at you that that's a tort claim. That's correct, and that's why we brought up the public policy of Idaho. It's against public policy. Separate the two for a second. You agree she doesn't have a statutory claim? I think the intent of the statute was to protect. Well, she can't. You can't do both. Because under Portneuf, either if you have a statutory claim, it supersedes the common law tort claim. But if you don't have a statutory claim, then the statute does enough to demonstrate Idaho's public policy that you would have a tort claim in that circumstance. So which one do you have? Well, it's a belt and suspenders, you know, if we don't have the. You have one or the other. That's your position. Okay. Did you raise a wrongful discharge tort claim in your brief? Is that, can you point me to where in the brief you discussed that or raised that argument? Not specifically in those terms. I would just point out, I'm out of time, that the district court made a lot of findings that were contrary to the record. He said, the district court said that no one ever said that, told my client to be quiet about it, but my client in his deposition said he told me to be quiet and not tell anyone. So my client went above his head to the school district. And then Mr. Barrett locked the gym and Mr. Kearns told him, unlock the gym. And those are the only two instances of insubordination that we know about, and those are related to the whistleblowing. I'm out of time, so I'll reserve the rest. You may reserve the rest and we'll give you a little bit more because we've asked a lot of questions. Mr. Hall? Thank you. Thank you, Your Honor. If it pleases the court, I'm going to lower this just a little bit. I don't know, you had that great Wizard of Oz thing going. Thank you. With regard to the whistleblower. Could you introduce yourself for the record, please? I apologize. My name is Blake Hall. I represent the Clark County School District. Clark County is a very, very rural school district located in Idaho on the Idaho-Montana border with a total population of under 2,000 people in the entire county. And the school district covers the entire county. Counsel, I'd like to start where we left off with Mr. Wessel, and that is with respect to Mrs. Barrett and whistleblowing. And I read the opening brief at pages 36 to 39 to encompass both the statutory claim for her and the wrongful discharge in violation of public policy, because basically what the argument is there is that he made a safety complaint about the propane tank, and that was the reason why both of them were fired. And then the discussion about why hers was pretextual actually took up more space than his. And I guess I don't understand why there wouldn't be a tort claim for her if, and I know you don't accept that there is enough factual information here for him to get past summary judgment, but I'd like you to assume for the sake of my question that there's enough evidence of pretext in firing him in retaliation for the propane complaint. Do you agree or disagree with the proposition that it would be against Idaho public policy to fire family members in retaliation for a whistleblowing event? I don't believe there's an Idaho case law on that. I know there's nothing specific, but I'd like to understand your position on that proposition. I believe that any common law claim would be superseded by the fact that the State adopted a specific statute. Except, so in your view, a family member, in my hypothetical, I did something whistleblowing and my employer fires my husband, my children, and my second cousin. None of them has a claim because they're not employees, so they don't have a whistleblower claim, but they also don't have a tort claim and the employer is free to do that? My comment was to the fact they would not have a whistleblower claim. They might have some other form of a tort claim for wrongful discharge. Right, wrongful discharge. That's what I asked you about. I apologize. Okay. Was that brought here? Was there a wrongful discharge claim? There was not. In this case, as I read the complaint, I don't read the complaint as having brought a wrongful discharge claim. Well, paragraph 55 very clearly states that there's a tort claim. And as I understand Idaho law, you could have moved to segregate that claim but didn't. So the fact that it's encompassed under the statute is not relevant. Whether or not they've preserved it through the rest of the case is a separate question, but the complaint says plaintiff's terminations from employment were also, right after alleging a whistleblower claim, a common law action that is contrary to the public policy of the State of Idaho. So they plainly brought a tort claim separate from the whistleblower claim. But never argued such a claim? Well, that's a separate question. That's the next question I was going to ask. Was that developed in the summary judgment proceedings and or on appeal? I don't believe they argued it in the summary judgment proceedings, and I don't believe that that's been preserved on appeal. Do we know what the elements are of a wrongful discharge for contrary to public policy or a tort claim contrary to public policy in Idaho? What are the elements of that claim? I apologize. I didn't hear the first part of your question. I was wondering if there's a tort claim, if they pled that she was fired contrary to public policies, wrongfully fired contrary to public policy, what are the elements of such a tort claim under Idaho law? What would the plaintiff have to prove? I'm not able to give you those elements because that was never argued at the lower level. I never had to research that and be able to provide an honest and intelligible answer to that question because I don't believe they preserved that claim. With regard to the whistleblower claim, though, I think it is interesting that ‑‑ Well, before we leave that, I'm reading the response to the motion for summary judgment, and there's a section of it devoted to why it says Mr. Barrett was terminated for whistleblowing. And, again, I'm asking you to assume that he was. Okay. I know you think he wasn't. And then it says it's undisputed that Mr. and Mrs. Barrett were terminated. There remains a question of fact whether the terminations were motivated by the participation in this protected activity. And the district judge then rules against it, says there's no whistleblowing. There's no causal connection. There's no causal connection, and so throws out the entire whistleblower claim. The question, I guess, I'm interested in is if we were to reinstate the whistleblower claim on the merits with respect to Mr. Barrett, doesn't Mrs. Barrett's claim come along with that? Well, it seems to me that her ‑‑ that the linchpin of her claim would have to rely upon there being a valid whistleblower claim on his part. Right. Absolutely. If there is no valid whistleblower claim on his part. Yes, that was the assumption about the questions that both of you were asking. I don't want to give you a chance to tell us why there isn't. But we've been focusing on the tail, maybe not the dog. And I would like to hear your thoughts on the whistleblower claim and why it's not valid. But I guess I'm still puzzled about the nature of a derivative whistleblower claim. We know there can be a derivative ADA claim. But I'd like to know if you can also address the elements of a derivative whistleblower claim under Idaho law, if there is any case on that. There are no cases that I'm aware of in the state of Idaho that recognize a derivative whistleblower claim. Can we go back then to the basic question of whistleblowing? And let me outline for you what my difficulty is and maybe you can help me with it. As I read the Idaho cases, and you know them better than I, it seems to say that if you were fired in relatively close proximity to disclosing the kinds of things covered by the whistleblower statute, that there's then a question of fact about causation. Is that a fair reading of the Idaho cases? I don't believe that that creates a question of fact. It may shift the burden under the pretext, and then you have to determine whether in fact there was a valid reason for that termination. But the district court here found there was no causation. Correct. So if we focus on causation for a second, if we focus on the district court's ruling, isn't it true that under Idaho law you can get to the jury on causation simply by showing that a firing occurred in relatively close proximity to the whistleblowing activity? There may be other reasons the case won't go to the jury because you can demonstrate that he was fired for a different reason. But at least on – isn't there a temporal causation link here? I believe that would only be a factor that the court would have to consider. It wouldn't be the – I don't think that that fact alone entitles you to get to a jury. What you think is that what happened – put it differently. Does it require the employer then to come up with non-pretextual reasons? Do you think that the Idaho whistleblowing cases, in effect, embody something like the McDonnell-Douglas framework? Well, because there are no Idaho cases, I'm assuming that that would be the case because there is no derivative. As opposed to just creating – see, that's what I'm struggling with. McDonnell-Douglas, as we know, has a series of burdens. I'm not sure I can read that into the Idaho Act. What the Idaho Act, as I read it, seems to say in the few cases under it, that if you get fired for engaging in protected – if you engage in protective activity, get fired relatively soon thereafter, that creates a question of fact for the jury about whether it was in response to the protected activity. And the employer can, of course, argue to the jury that, no, it wasn't, because he was a terrible employee and there were lots of other reasons. But I'm not sure that we import the McDonnell-Douglas framework into it to let you get out, you know, at the third stage. What's your response to that? It would only be speculation because, again, there is no Idaho case law on that issue. I thought Curley had said that courts should only look to other plaintiffs as presented a prima facie case of retaliatory discharge under the Whistleblower Act and that it wasn't – that you didn't go through the whole process at the summary judgment stage. Is that not correct? That is not the way I understand it, but I may be in error in my comprehension of it. Quite frankly, as I look at it, the real test is whether or not he was ever engaged in any protective act, because if he is not – doesn't have a whistleblower claim and there is – he was not engaged in any protected act, then this other discussion that we're having becomes irrelevant. But didn't he go to the school board at some point and say there's a safety hazard in the gym because of this – I think it's – is it a boiler? Propane tank. Propane tank. Propane tank. Yep. Okay, and that surely – if you were fired in response to doing that, would you have a whistleblower claim? If that's what had occurred, that's not – No, but I'm – no, but he did engage in protected activity. You said he didn't engage in any protected activity. I believe he did not. As this Court, in fact, Judge Graber indicated in the Clark case, analyzing the Oregon statute, which is virtually identical to the Idaho statute with regard to whistleblower, merely reporting publicly available information does not constitute a protected disclosure. Why was this publicly available information? Did the public know there was a problem with the propane tank? Absolutely. The board, if you look at the record, the school board knew of the propane leak and the issue as early as January of 2012. Who did they learn that from? They learned that both from themselves and from the superintendent, and that's found in the records of excerpts at page 94 through 96. Well, I guess let me ask the question slightly differently. Did they learn it independently of Mr. Barrett? Yes. Through what source? They're there on a regular basis. They were aware of this situation, and Mr. Barrett, by his own testimony, indicates – in fact, they were so aware of it that they had already called on having different companies come out and take a look at the problem and start to get bids on the problem. And Mr. Barrett, by his own testimony, indicates that he first reported to the school board the issue of the propane in March of 2012. I thought in January of 2012 it was Mr. Barrett who told Kearns about the problem initially. I guess I'm confused. I believe that is a confusion. What Mr. Barrett told Mr. Kearns at that time was that they'd had, pursuant to the instructions that the school board had given to Mr. Kearns, to go ahead and begin to get bids on what it was going to cost and what it was going to take to fix this remedy. But isn't he the one who told Kearns? I thought that's what the record showed, was that he is the one who advised Kearns that other people had smelled propane or gas or whatever. That's in his affidavit. So taking it in the light most favorable to him, I guess we have to credit that. But I have another question, which is, in March, Sermon Electric first stated that the tank was not in legal state. It was not up to code and it was a violation of law. And that, is that the first time, or was there some information before that about a violation of law associated with the tank? The March discussion, the board already knew that the tank was leaking and that the tank needed to be repaired and that it was creating a hazardous condition. Judge Acuda's question, I think, and it's the one I'm interested in too, is had the board been previously told that somebody had looked at this and found that it was in violation of law, the local inspector? Well, any, no, there is no local inspector. Somebody came and said this was in violation of law, correct? One of the propane people who came out and did a review. And said, I've looked at this and it's in violation of law, correct? Did the board know that before Mr. Barrett told them? I believe they did. That appears to be in the affidavit of the chairman of the board. The affidavit seems to say we knew there was a problem. But is there any direct evidence that the board knew there was a legal violation? So he, Mr. Barrett says that Kearns told him to keep quiet about it. That's his testimony. Right. His testimony was that it is for the effect that Mr. Barrett told him to keep quiet about the cost, about the cost it was going to take to repair, not to keep quiet with regard to the fact that there was a leak and that the leak needed to be repaired. I think that may have been Mr. Kearns' testimony, but I think Mr. Barrett's testimony was to the contrary, that Kearns told him to keep quiet about the problem. And for purposes of summary judgment, don't we have to take that as a fact? Well, certainly the rule is with regard to summary judgment that you have to take the facts most favorable to the non-moving party. Yes. And I know you've, can I ask? Yeah. Because I'm interested in this factually. I want to make sure I have my facts right. I think the record is clear that people, how they first learned, put aside for a second, knew for some period of time that there was a problem with the propane tank. But at some point, a contractor came out and looked at it and said to Mr. Barrett, yes, there is a problem and it violates the law. At least that's what he says. And my question is, what I was trying to ask before, is when was the first time that the school board learned that somebody had said it was in violation of the law? Well, the school board believed that it was. No, don't tell me what they believed. I just want to know when they were, because what you said is you can't, you said Judge Graber's prior opinion said if you're disclosing already publicly available information, then it may not be whistleblowing. So the information I'm focusing on is that a contractor had determined that this violated the law. Isn't it true that the school board learned that from Mr. Barrett? I don't believe so, Your Honor, but honestly, the record is devoid of a specific date. He says that they learned of that. Okay. Thank you. I just need to have the facts straight. And I appreciate that, and I don't think the record states a specific date. I believe that the school board believed that they knew about that in January of 2012, but whether they only, they certainly knew about the problem, and they knew that that created a dangerous condition for their students, and that's why they were concerned about it, and that's why they started to hire people to go out and review it and to address the problem. Whether they knew it was a violation of a building code, I can't answer that. Thank you, counsel. You've exceeded your time. We understand your client's position. Thank you. Thank you. First, let me just clear up a couple of the questions that the panel had. I don't know how much this helps my case, but in Curley, the court specifically found that McDonnell-Douglas burden-shifting analysis applied to the whistleblower statute. So it does apply. Does it apply at, so it says, while the burden-shifting analysis is applicable at trial, it was error for the district court to apply it at the summary judgment stage. So does it apply at the summary judgment stage or not? It does, and it generally applies, but not at the summary judgment stage. But it does, the opinion talks about that. To create enough of a genuine issue material fact to get to the jury, do we go through the whole McDonnell-Douglas burden-shifting analysis, or do we just look at whether your client created a prima facie case? You look at just basically the prima facie case, and Curley also says that. So this stuff becomes a defense that the defendant can put onto the jury. Right. And there may be burdens of persuasion attached to it, but not burdens of production. Right. But it does say that causation is a question of fact in almost all cases in that one. Now, regarding the violation of public policy, pages 8 and 9 of the court's decision is all about public policy. I'm sorry, yeah, that's pages 8 and 9 of the record. And so we did bring that up, and we did preserve it, and the district court goes through the steps but found that against us on that issue. Now, as to what was the first time that the school district found out about a violation of law in the billing code, for the first time that came in a letter sent to Ryan Barrett from Mike Holman at Sermon Electric. It's page 302 of the record. That's the first time that we knew that there was a safety issue and a code violation. You know, people had smelled propane before that, but the whistleblower statute requires this. So what does the record show with regard to how that information was communicated to the school district? Mr. Barrett went on the 13th of March and showed it to Mr. Kearns, and Mr. Kearns agrees that that happened in his deposition. And Mr. Kearns said, be quiet about this. We don't have the money. And then Mr. Barrett took it to the school board and gave it to the school board. Thank you, counsel. You've also exceeded your time. We appreciate the arguments of both counsel. And the case just argued is submitted.
judges: Graber, Ikuta, Hurwitz